PEOPLES LOAN & INVESTMENT COMPANY *v.* KING, ADMINISTRATOR.

4-9699                                                    247 S. W. 2d 21

Opinion delivered March 17, 1952.

*Harper, Harper & Young,* for appellant.

*Franklin Wilder* and *Gutensohn & Ragon,* for appellee.

ROBINSON, J. The issue of priority of liens on three automobiles is involved here. W. A. Head, who was engaged in operating taxicabs in Fort Smith, borrowed

money from Thomas E. King to purchase taxicabs. (King is now dead and the case has been revived in the name of the administrator of his estate.) The cabs became dilapidated and worn out to the extent that they could no longer be operated at a profit. Head borrowed additional money from King which he used, along with the trade-in of the old cars, to procure two new Mercury automobiles and a used Chevrolet automobile. He gave King a bill of sale and title retaining note on the Chevrolet, and a title retaining note on each of the Mercuries.

Head also gave to the appellant, Peoples Loan & Investment Company, a bill of sale and title retaining note on each of the cars. There is a discrepancy as to the motor number on the note given to King and the note given to the Loan Company on the Chevrolet, but the evidence is convincing that both notes apply to one and the same car. These transactions occurred before our present automobile title law became effective. The "pink slips" issued by the Revenue Department to Head in connection with purchase of automobile licenses showed a lien in favor of the Loan Company. These "pink slips" were kept in the office from which the cabs operated. Neither transaction was recorded.

Head defaulted in payments of the notes to King and apparently disappeared. Upon investigation by King at the Cab Company office, he discovered the "pink slips," which showed a lien in favor of the Loan Company. This was the first knowledge King had that the Loan Company was interested in the automobiles. He immediately took the matter up with that Company, which was the first information the Company had of King's interest. The preponderance of the evidence proves that King and the Loan Company entered into an agreement that they would have the automobiles operated for the mutual benefit of both parties in an attempt to recoup their money. King's testimony is positive to that effect and there is no substantial testimony to the contrary. In this connection, W. A. Needham, vice-president of appellant Company, testified:

Q. And you did, after it became obvious that Mr. King and yourself had had the same transaction pulled on you, there was some discussion of an attempt to let the cabs pay themselves out?

A. Yes, sir, Brigham Gann tried to do it for a while and it didn't work out.

\* \* \* \* \*

Q. Didn't you tell Mr. King that you wanted him to go ahead and take charge and operate the 3 cabs and see if they couldn't pay out, and didn't he go up and spend his time trying to collect the money from the boys?

A. We left the cars on the line for a while—I don't know how long it was—I don't remember how long.

\* \* \* \* \*

Q. You understood that if there was a profit made that you would receive something on your indebtedness equally with him, didn't you?

A. If it was paid in from the Peoples Cab and Baggage, that is where the money has to be paid in.

\* \* \* \* \*

Q. You knew he (King) was operating three cabs and they were on the line?

A. They were on the line.

Q. Do you know how long they were on the line?

A. Just a short period of time—not long.

Q. He (King) says it was three months. Do you deny that it was that long?

A. I don't say it was that long.

Q. What, in your best judgment, was the length of time that they continued to operate?

A. I would say a maximum of six weeks to two months.

\* \* \* \* \*

Q. Mr. King at no time recognized you as having superior title to him in connection with these operations up there?

A. No, sir.

\* \* \* \* \*

Q. Mr. Needham, did you have any agreement or discussion with Mr. King about working out these Mercuries until after you took this receipt?

A. I misunderstood that question. We did discuss it. Yes, sir.

Q. Before you took this agreement?

A. Yes, sir.

Q. Was anything done about it?

A. They just started on the line hoping that some money would be paid in and which was not, but I am sorry I misunderstood your question.

Q. And when nothing was done about it you went and took possession of the cars?

A. That is right, and we received no money at all.

\* \* \* \* \*

The venture of operating the taxicabs proved unsuccessful, and, without giving King any warning or notice, the Loan Company took possession of the automobiles. King then filed suit against the Loan Company for conversion. A jury was waived and the trial court entered a judgment for King in the sum of $2,985, the total value of the three automobiles.

The appellant Loan Company contends that its transaction with Head and King's transaction with Head amounted to Head giving each a mortgage; that both the Loan Company and King are in the position of holders of unrecorded mortgages, and, since the Loan Company has possession of the property, it should prevail. It was stipulated that the Loan Company had possession of the cars when suit was filed and that appellee has never had possession. It is true that King never actually had physical possession of the automobiles, but, it is also true that the Loan Company did not rightfully have possession. When King discovered that the Loan Company had some kind of lien, he went to the Company's office and talked

with Mr. Needham, vice-president, about it. Neither King nor the Loan Company had possession of the automobiles at that time. The testimony is convincing that the parties agreed to the operation of the cars for the mutual benefit of each.

Appellee contends that Head made an outright sale to King, and the King estate is therefore owner of the title and the Loan Company is liable for conversion. But, we agree with appellant that the transactions whereby Head gave to King and the Loan Company bills of sale and title retaining notes, or title retaining notes alone, on the cars, amount to the giving of mortgages.

In 47 Am. Jur., p. 19, it is stated: "A conditional sales contract contemplates a vendor and vendee, not a lender and a borrower of money, and therefore, an instrument, although in the form of a conditional sales agreement, which is executed for the purpose of securing the payment of a loan of money, will be treated as a chattel mortgage. Where a borrower, the owner of property, executes an absolute bill of sale to a lender, who as part of the same transaction gives a conditional bill of sale to the original owner, conditioned on the repayment of the stipulated sum, the transaction is generally held to be a mortgage where there is no change of possession."

In *American Mortgage Co.* v. *Williams*, 103 Ark. 484, 145 S. W. 234, this court said: "The rule for determining whether a transaction is a mortgage or conditional sale, no matter what its form may be, is thus stated in 3 Pomeroy's Eq. Juris., 1195, which is quoted with approval by this court in the case of *Hays* v. *Emerson*, 75 Ark. 551, 87 S. W. 1027: 'The criterion is the continued existence of a debt or a liability between the parties, so that the conveyance is in reality intended as a security for the debt or indemnity against the liability. If there is an indebtedness or a liability between the parties, either a debt existing prior to the conveyance or a debt arising from a loan made at the time of the conveyance, or from any other cause, and this debt is still left subsisting, not being discharged or satisfied by the conveyance, but the

grantor is regarded as still owing and bound to pay it at some future time, so that the payment stipulated for in the agreement to reconvey is in reality the payment of the existing debt, then the whole transaction amounts to a mortgage, whatever language the parties may have used and whatever stipulations they may have inserted in the instrument. On the contrary, if no such relation whatever of debtor and creditor is left subsisting, then the transaction is not a mortgage but a mere sale and contract of repurchase.'" In the case at bar, it appears that title was reserved to King and to the Loan Company merely as security for the debts.

Ordinarily, as between the holders of unrecorded mortgages on the same property, the mortgagee in possession would prevail. *Jones v. Ross,* 179 Ark. 116, 14 S. W. 2d 239. But, here, when King found out that the Loan Company had an interest in the automobiles, neither he nor the Loan Company had possession of the cars, and King could have filed suit immediately in order to protect his interest, and, being the first in order of time, probably would have prevailed. However, he did not take such action, but went to the Loan Company, where, after a discussion of the matter, the parties entered into an agreement to operate the cars for their mutual benefit. When they made this agreement, it was implied that neither would attempt to take advantage of the other by obtaining possession of the automobiles, or otherwise; that each would recognize the other's interest, and that the operation, or sale, of the cars would be for their mutual benefit. Therefore, each is entitled to a part of the proceeds of the sale of the cars, in proportion to the amount of his debt.

We are uncertain from the record before us as to whether the cars have been sold by consent of King and the Loan Company. If so, then all the costs of this litigation should be paid from the proceeds and the balance divided between King and the Loan Company in proportion to the debt owed each. If the cars have not been sold and if the parties cannot agree on a sale, then on motion of either party the court will order the cars sold as on

execution sale, with all costs of this action to be paid from the proceeds thereof, and the balance divided between King and the Loan Company, as aforesaid.

Reversed.

Mr. Justice HOLT not participating.

GEORGE ROSE SMITH, J., dissenting. I agree that these two litigants took possession of the cars jointly, but I do not think the evidence supports the finding that their conduct amounted to an agreement to share the proceeds of sale. It seems to me that their equities are equal, and under a familiar principle the equity prior in time should prevail. *Miller* v. *Mattison,* 105 Ark. 201, 150 S. W. 2d 710. I would therefore affirm the judgment.